RECORD NO. 17-2112

# United States Court of Appeals for the Fourth Circuit

PULTE HOME CORPORATION and
SHILOH FARM INVESTMENTS LLC,

*Plaintiffs-Appellants,*

v.

MONTGOMERY COUNTY, MARYLAND, and
MARYLAND-NATIONAL CAPITAL
PARK AND PLANNING COMMISSION,

*Defendants-Appellees.*

*On Appeal from the United States District Court for
The District of Maryland at Greenbelt in Case No. 8:14-CV-03955-GJH
(George Jarrod Hazel, U. S. District Court Judge)*

## BRIEF OF APPELLANTS

Deborah J. Israel
Louis J. Rouleau
Lela M. Ames
Pascal F. Naples
Womble Bond Dickinson (US) LLP
1200 Nineteenth Street, N.W., Suite 500
Washington, DC 20036
(202) 857-4466

*Counsel for Appellants Pulte Home Company,
LLC (formerly Pulte Home Corporation) and
Shiloh Farm Investments, LLC*

November 20, 2017

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pulte Home Company, LLC (formerly known as Pulte Home Corporation) and Shiloh Farm Investments, LLC, who are appellants, make the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity? No.

2. Does party/amicus have any parent corporations? Yes. If yes, identify all parent corporations, including all generations of parent corporations:

   Pulte Home Company, LLC is wholly owned by PulteGroup, Inc.
   Shiloh Farm Investments, LLC is wholly owned by PulteGroup, Inc.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? Yes. If yes, identify all such owners:

   Pulte Home Company, LLC is wholly owned by PulteGroup, Inc.
   Shiloh Farm Investments, LLC is wholly owned by PulteGroup, Inc.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? No.

5. Is party a trade association? No.

6. Does this case arise out of a bankruptcy proceeding? No.


Dated: November 20, 2017        */s/ Deborah J. Israel*_____
                                 Deborah J. Israel

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ...............................................................v

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.........................................................2

STATEMENT OF THE CASE ............................................................3

SUMMARY OF THE ARGUMENT ...................................................11

ARGUMENT ..................................................................................12

    I.    STANDARD OF REVIEW .................................................12

    II.    IN GRANTING THE RULE 12(C) MOTIONS, THE DISTRICT COURT ERRED IN CONSIDERING, RELYING UPON, AND CREDITING AS TRUE DOCUMENTS OUTSIDE THE COMPLAINT................................13

        A.    The Master Plan Amendment Is Not Integral to the Complaint........................................................14

        B.    The District Court Erred in Treating the Contents of the Master Plan Amendment as True .....................18

    III.    THE DISTRICT COURT ERRED IN DISMISSING PULTE'S EQUAL PROTECTION CLAIM ......................................21

        A.    Whether Government Discrimination Is Rationally Related to a Legitimate Interest Is a Question of Fact...............................................................24

        B.    The Allegations in the Complaint State an Equal Protection Claim .........................................................26

    IV.    THE DISTRICT COURT ERRED IN DISMISSING PULTE'S TAKINGS CLAIM .............................................30

A.  Takings Claims Turn on a Fact-Intensive Analysis..................31

B.  The District Court Disregarded the Relevant
    Precedent............................................................................34

C.  The District Court Erroneously Construed the
    Pleadings in the Light Most Favorable to the
    Moving Party.......................................................................37

V.  THE DISTRICT COURT ERRED IN HOLDING THAT
    PULTE FAILED TO ALLEGE THE DEPRIVATION
    OF A CONSTITUTIONALLY PROTECTED PROPERTY
    INTEREST ..........................................................................39

    A.  Pulte Possesses Constitutionally Protected Property
        Interests ........................................................................40

        1.  Pulte had a vested property interest in the
            County's preexisting zoning when it purchased
            property, designated as a TDR-receiving area,
            and then purchased TDRs and recorded them...............41

        2.  Pulte had a property interest in the right
            to use its land in accordance with the TDR
            Program, Master Plan, SRA 12-01, and
            Maryland Storm Water Management Act .....................45

        3.  Pulte had a protected interest in
            the proper consideration of its water-sewer
            reclassification ...............................................................47

    B.  Defendants Deprived Pulte of Its TDRs ...................................48

VI.  THE DISTRICT COURT ERRED IN HOLDING THAT
     PULTE FAILED TO ALLEGE THAT DEFENDANTS
     ARBITRARILY AND IRRATIONALLY VIOLATED
     PULTE'S SUBSTANTIVE DUE PROCESS RIGHTS ....................49

    A.  Whether "No Process" Could Have Protected
        Pulte's Due Process Rights Depends on the Facts
        of the Dispute ............................................................................50

iii

B.    Read in the Light Most Favorable to Pulte, the
      Complaint Alleges That Defendants' Actions Were
      Arbitrary and Irrational ...............................................52

VII.  THE DISTRICT COURT ERRED IN DISMISSING
      PULTE'S CLAIM UNDER ARTICLE 19 OF THE
      MARYLAND CONSTITUTION ........................................55

      A.    An Article 19 Claim Does Not Require a
            Constitutionally Protected Property Interest............55

      B.    An Article 19 Claim Does Not Require Actual
            Immunity From Suit.................................................56

CONCLUSION ........................................................................58

REQUEST FOR ORAL ARGUMENT ...................................59

CERTIFICATE OF COMPLIANCE.......................................60

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*A Helping Hand, LLC v. Baltimore Cty.*,
    515 F.3d 356 (4th Cir. 2008)...................................................... 41, 43

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004)................................................ 13, 17, 18

*Ark. Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012) ............................................................... 31, 37

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................12

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ...................................................15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................12

*Berger v. City of Mayfield Heights*,
    154 F.3d 621 (6th Cir. 1998)........................................................28

*Bd. of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972) ....................................................................40

*Borden's Farm Prods. Co. v. Baldwin*,
    293 U.S. 194 (1934) ...................................................... 26, 27, 29

*Carroll v. Yates*,
    362 F.3d 984 (7th Cir. 2004)........................................................18

*Catanzaro v. Weiden*,
    140 F.3d 91 (2d Cir. 1998)...........................................................51

*Chancellor Manor v. United States*,
    331 F.3d 891 (Fed. Cir. 2003)................................................. 35, 36

*Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*,
   794 F. Supp. 2d 602 (D. Md. 2011) ................................................14

*Cienega Gardens v. United States*,
   331 F.3d 1319 (Fed. Cir. 2003).........................................................34

*Cienega Gardens v. United States*,
   503 F.3d 1266 (Fed. Cir. 2007).........................................................31

*City of Annapolis v. Waterman*,
   745 A.2d 1000 (Md. 2000)........................................................ 38, 39

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .........................................................................24

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
   920 F.2d 1496 (9th Cir. 1990) .........................................................28

*Doe v. Doe*,
   747 A.2d 617 (Md. 2000).................................................................56

*Dolan v. City of Tigard*,
   512 U.S. 374 (1994) .........................................................................38

*Drager v. PLIVA USA, Inc.*,
   741 F.3d 470 (4th Cir. 2014)......................................... 12, 13, 16, 18

*Dua v. Comcast Cable of Md., Inc.*,
   805 A.2d 1061 (Md. 2002)....................................................... 55, 56

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir.1999)............................................................13

*Exec. 100, Inc. v. Martin Cty.*,
   922 F.2d 1536 (11th Cir. 1991).......................................................28

*First English Evangelical Lutheran Church v. Cty. of Los Angeles*,
   482 U.S. 304 (1987) .........................................................................38

*Fla. Rock Indus., Inc. v. United States*,
   45 Fed. Cl. 21 (1999) ...................................................................................34

*Frall Developers, Inc. v. Bd. of Cty. Comm'rs for Frederick Cty.*,
   No. CCB-07-2731, 2008 WL 4533910 (D. Md. Sept. 30, 2008) ....... 41, 42, 48

*Ga. Outdoor Advert., Inc. v. City of Waynesville*,
   900 F.2d 783 (4th Cir. 1990)................................................................. 32, 33

*Giarratano v. Johnson*,
   521 F.3d 298 (4th Cir. 2008)................................................................. 25, 26

*Global Network Commc'ns, Inc. v. City of New York*,
   458 F.3d 150 (2d Cir. 2006).........................................................................15

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016).........................................................................15

*Goines v. Valley Cmty. Servs. Bd.*,
   822 F.3d 159 (4th Cir. 2016)................................................................ *passim*

*In re GNC Corp.*,
   789 F.3d 505 (4th Cir. 2015).......................................................................12

*Jackson v. Dackman Co.*,
   30 A.3d 854 (Md. 2011)................................................................. 55, 56, 57

*Johnson v. Md. State Police*,
   628 A.2d 162 (Md. 1993).............................................................................56

*Keenon v. Conlisk*,
   507 F.2d 1259 (1974) ..................................................................................27

*Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, No. 13, Sept.
   Term, 2017, 2017 WL 5507725 (Md. Nov. 17, 2017)..............................41, 42

*Lockary v. Kayfetz*,
   917 F.2d 1150 (9th Cir. 1990)......................................................................51

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) .........................................................................36

*Maritrans Inc. v. United States*,
    342 F.3d 1344 (Fed. Cir. 2003) ....................................................36

*Marks v. City of Chesapeake*,
    883 F.2d 308 (4th Cir. 1989) .........................................................50

*Md. Reclamation Assocs. v. Harford Cty.*,
    994 A.2d 842 (Md. 2010) ....................................................... 41, 42

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008).........................................................28

*MLC Auto., LLC v. Town of S. Pines*,
    532 F.3d 269 (4th Cir. 2008)............................................. 49, 50, 51

*Moore v. City of Costa Mesa*,
    886 F.2d 260 (9th Cir. 1989)..........................................................31

*Murr v. Wisconsin*,
    137 S. Ct. 1933 (2017) ......................................................... 30, 31, 33

*N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*,
    163 F.3d 449 (7th Cir. 1998)..........................................................20

*Naegele Outdoor Advert. v. Durham*,
    844 F.2d 172 (4th Cir. 1988).........................................................32

*Nat'l Waste Managers, Inc. v. Anne Arundel Cty.*,
    763 A.2d 264 (Md. Ct. Spec. App. 2000) ................................. 41, 42

*Pa. Coal Co. v. Mahon*,
    260 U.S. 393 (1922) .......................................................................33

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001) ................................................. 30, 31, 34, 35

*Parrino v. FHP, Inc.*,
　　146 F.3d 699 (9th Cir. 1998)............................................................17

*Paskvan v. City of Cleveland Civil Serv. Comm'n*,
　　946 F.2d 1233 (6th Cir. 1991)........................................................44

*Penn Central Transp. Co. v. New York City*,
　　438 U.S. 104 (1978) ......................................................................30

*Perry v. Sindermann*,
　　408 U.S. 593 (1972) .......................................................... 40, 41, 44

*Phillips v. LCI Int'l, Inc.*,
　　190 F.3d 609 (4th Cir. 1999)..........................................................18

*Piselli v. 75th St. Med.*,
　　808 A.2d 508 (Md. 2002)...............................................................57

*Plyler v. Doe*,
　　457 U.S. 202 (1982) .............................................................. 24, 25

*Polk Co. v. Glover*,
　　305 U.S. 5 (1938) .............................................................. 26, 27, 29

*Prince George's Cty. v. Carusillo*,
　　447 A.2d 90 (Md. Ct. Spec. App. 1982) .......................................47

*Rios v. Montgomery Cty.*,
　　872 A.2d 1 (Md. 2005)...................................................................56

*Sansotta v. Town of Nags Head*,
　　724 F.3d 533 (4th Cir. 2013)................................................ 40, 45

*Scott v. Greenville Cty.*,
　　716 F.2d 1409 (4th Cir. 1983)........................................................50

*Select Portfolio Servicing, Inc. v. Saddlebrook W. Util. Co.*,
　　145 A.3d 19 (Md. Ct. Spec. App. 2016), *rev'd on other grounds*,
　　167 A.3d 606 (Md. 2017)................................................................43

*Sherman v. Town of Chester*,
    752 F.3d 554 (2d Cir. 2014)................................................................39

*Siena Corp. v. Mayor & City Council of Rockville*,
    873 F.3d 456 (4th Cir. 2017)...................................................... 46, 47

*Simi Inv. Co. v. Harris Cty.*,
    236 F.3d 240 (5th Cir. 2000)...........................................................51

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013)...........................................................28

*U.S. Fidelity & Guar. Co. v. McKeithen*,
    226 F.3d 412 (5th Cir. 2000)...........................................................35

*W. Montgomery Cty. Citizens Ass'n v. Md.-Nat'l Capital Park & Planning
    Comm'n*,
    522 A.2d 1328 (Md. 1987)..................................................... *passim*

*Willis v. Town of Marshall*,
    426 F.3d 251 (4th Cir. 2005)...................................................... 21, 22

*Yancey v. United States*,
    915 F.2d 1534 (Fed. Cir. 1990)........................................................34

*Yuba Goldfields, Inc. v. United States*,
    723 F.2d 884 (Fed. Cir. 1983).........................................................32

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015)...........................................................14

*Zobel v. Williams*,
    457 U.S. 55 (1982) ................................................................. 22, 23

## **Constitutional Provisions**

U.S. Const. amend. V................................................................30

U.S. Const. amend. XIV, § 1 ...................................................... 21, 39

Md. Const., Decl. of Rights, Art. 19 .................................................................55

**Statutes**

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1367 ........................................................................................1

Montgomery Cty., Md. Code, Art. 59-A (2004) .....................................43

**Other Authority**

5C Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1368 ..............13

Timothy Sandefur, *Rational Basis & the 12(B)(6) Motion:  An Unnecessary "Perplexity"*, 25 Geo. Mason U. Civ. Rts. L.J. 43 (2014) ..............................25

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Maryland ("District Court") had jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.   On November 14, 2014, Appellants, Pulte Home Company, LLC (formerly known as Pulte Home Corporation) and Shiloh Farm Investments, LLC (collectively, "Pulte"), filed this action against Defendants, Montgomery County, Maryland ("County") and Maryland-National Capital Park and Planning Commission ("Commission") (collectively, "Defendants"), in Montgomery County Circuit Court.   Pulte asserted claims under the Due Process and Takings Clauses of the U.S. and Maryland Constitutions, the Equal Protection Clause of the U.S. Constitution, and Article 19 of the Maryland Constitution.   On December 18, 2014, the Commission, with the consent of the County, removed the case to federal court.

On August 25, 2017, the District Court entered an Order granting Defendants' Motions for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) ("Motions" or "Rule 12(c) Motions").   Pulte timely filed a Notice of Appeal on September 21, 2017.   This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment that disposed of all parties' claims.

## STATEMENT OF THE ISSUES

Whether, in granting Defendants' Rule 12(c) Motions, the District Court committed reversible error by:

(1)     considering, relying upon, and crediting as true documents outside the complaint without giving Pulte an opportunity to challenge the evidence or giving Pulte an opportunity to amend its complaint;

(2)     resolving on a Rule 12(c) motion disputed factual issues of whether Defendants acted rationally for purposes of Pulte's equal protection and due process claims;

(3)     resolving disputed factual issues without a record and drawing inferences against Pulte with respect to its takings claim;

(4)     holding that Pulte has no constitutionally protected property interests; and

(5)     dismissing Pulte's claim under Article 19 of the Maryland Constitution.

## STATEMENT OF THE CASE

For nearly 30 years, Defendants administered a system encouraging residential development in the Clarksburg area, including the subject property. *See* JA30-39. In accordance with that system, beginning in 2004, Pulte purchased land, acquired and recorded transferable development rights ("TDRs"), and planned for residential development. JA38. In 2009, Pulte duly filed an application for water and sewer service, an important initial step in the development process. JA38-39. Contravening their own policies and procedures, Defendants refused to act upon Pulte's application. JA38-41. Thereafter, Defendants engaged in a campaign targeting Pulte and its property. *See generally* JA48-77. Defendants' coordinated targeting of Pulte occurred over many years and at nearly every level of government. *See generally id.*; *see also* JA600, JA622, JA624, JA629, JA633, JA645, JA651-52, JA665, JA671, JA673 (singling out Pulte, by name).

Defendants' actions were arbitrary, improper, and lacked a rational basis. JA84. Defendants manipulated their own "expert opinions," JA65-66, and ignored science and data that were contrary to their pre-determined and desired outcome of preventing Pulte from developing its property, JA84. Defendants' conduct culminated in 2014 with the enactment of an illegal amendment downzoning Pulte's property and eliminating it as a TDR-receiving area. JA77.

3

After watching its property, slated for residential development, downzoned to essentially farmland, Pulte sought relief in state court. JA29-104. In response, Defendants removed the case to federal court, JA23-26, while simultaneously arguing that federal courts have no place in land use decisions and advocating standards of review so deferential they are virtually nonexistent, JA198-240.

This is not a garden variety zoning case where a plaintiff purchased property in reliance on zoning alone and the zoning changed before the plaintiff obtained a permit. *See, e.g.,* JA35-38. Pulte purchased and recorded TDRs, and had a legitimate claim of entitlement to use its property in a manner consistent with its designation as a TDR-receiving area and consistent with Defendants' blueprint for the Pulte property. JA35.

**1984-2009: A Longstanding Plan to Increase Density and to Encourage Residential Development**

Pulte purchased the subject property based upon Defendants' long established master plan and other laws, all of which encouraged residential development with increased density along the I-270 corridor. JA30. To manage the impact of residential development, Defendants enacted zones of protectable land and zones for higher density growth. *Id.* Pulte's property was designated for higher density residential development. *Id.*

In 1984, the County enacted a TDR Program, allowing rural property owners to sell development rights to third parties, who could then use those rights to

increase the development density of land in residential areas.  JA35-36, JA38; *see also W. Montgomery Cty. Citizens Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 522 A.2d 1328, 1330-31 (Md. 1987).  The program, in deliberate fashion, both encouraged development in planned residential areas and the preservation of open space in rural areas.  JA35-36.

Ten years later, in 1994, Defendants passed the Clarksburg Master Plan ("Master Plan"), a comprehensive development plan that considered the area's environmental and economic needs.  JA35, JA51.  The Master Plan divided Clarksburg's development into "four sequential stages."  JA35.  Once the triggers for Stage 4 were met, the Master Plan "directed that . . . the County Council will consider Water and Sewer Plan amendments that would permit the extension of public facilities to the Ten Mile Creek Area."  JA37 (internal quotation marks omitted).

The Master Plan also "defined the environmental factors the County must rely on when considering sewer reclassification requests."  *Id.*  It required the County to "draw upon the standards established by federal, state, and County laws and regulations" and "directed the County to consider all voluntary measures taken by property owners in the Stage 4 area to protect water quality" in order to allow growth while protecting the environment.  JA36-38 (internal quotation marks omitted).  The Master Plan provided for planned growth.  JA35.  In particular, the

Master Plan designated the property at issue for residential development at a higher density. *Id.*

After the Master Plan had been in place for over a decade (and the TDR program for over two decades), Pulte began purchasing residentially zoned land and TDRs in Clarksburg. JA38. Between 2004 and 2006, Pulte purchased 541 acres in Clarksburg at a cost of almost $50 million and 323 TDRs for approximately $12 million. *Id.* Pulte purchased all of its land in areas zoned "RE-1/TDR-2[,]" which entitled Pulte to build at a residential density of one unit per acre, but "strongly encourage[d]" development at a density of "two units per acre through the purchase of TDRs." JA35. With that in mind, Pulte promptly recorded all of its TDR purchases with the Montgomery County Recorder of Deeds. JA38.

In 2007, Maryland's General Assembly enacted the Storm Water Management Act, which required the use of Environmental Site Design ("ESD") in all developments within the State. JA46-48. ESD is a collection of state-of-the-art stormwater management techniques that "slow[s] and manage[s] runoff and allow[s] for slower filtering of water during development and thereafter." JA46-47. In 2008, the County enacted its own regulations to require the utilization of ESD in all developments within the County. JA46.

By 2009, the Master Plan's Stage 4 triggers had been met and the time for Pulte's development had ripened; Pulte had invested $62 million in land and TDRs in Montgomery County, and Pulte had made substantial efforts to ensure compliance with the TDR program, the Master Plan, and the Storm Water Management Act. JA38-39. Accordingly, Pulte filed its water and sewer reclassification request with the County to trigger "its by-right development of the subject property." *Id.*

**2009-2014:  An Arbitrary and Irrational Targeting of Pulte**

Beginning in 2009, Defendants engaged in a pattern of illegal actions that targeted Pulte and Pulte's property. JA38-41. For example, despite previously processing water and sewer reclassification requests on a biannual basis, the County mothballed Pulte's request. *Id.* Such requests are a necessary first step in the development process. JA38-41, JA46. At the same time, however, in September 2012, the County approved Subdivision Regulation Amendment ("SRA") 12-01, placing Pulte's property in Tier II, *i.e.*, properties that were "to receive public sewer in order to serve planned development." JA39. Thus, while the County scheduled Pulte to receive public sewer service, the County inexplicably stonewalled Pulte's application to obtain these services. JA38-41.

Thereafter, in October 2012, Defendants continued to illegally block Pulte from developing by reopening the Master Plan to address alleged water issues.

JA48.   For the next two years, Defendants ignored and violated their own procedures, engaged in ex parte communications, accepted evidence after the close of the record, considered evidence off the record, and manufactured fraudulent evidence, all to reach a predetermined conclusion.  JA48-77.  Defendants actively manipulated expert reports and disregarded their own scientific experts' recommendations as well as Pulte's experts' evidence, all of which showed that Pulte's plan for development would protect the environment and improve water quality.  *Id*.

Ultimately, in 2014, Defendants amended the Master Plan ("Master Plan Amendment" or "Amendment") and enacted a series of changes to local land use law specifically targeted at Pulte.  JA77-82.  In particular, the County downzoned Pulte's land to an agricultural classification, imposed a "radically low" 6 percent impervious surface limitation, a "radically high" 80 percent open space requirement, a parkland dedication requirement, an extraordinary conservation management plan requirement, and "other stringent development requirements . . . cumulatively applicable to no other property in the Ten Mile Creek watershed of Clarksburg."  JA83.

Simultaneously with reopening the Master Plan, the County announced an extraordinary and indefinite moratorium on all pending water-sewer reclassification requests.  JA46.  And so, Pulte's five-year-wait for a decision

continued even though the Master Plan "directed" the County to "consider" Pulte's water and sewer reclassification request.  JA37.

**2014-Present:  Defendants' Efforts to Evade Judicial Review**

In November 2014, Pulte filed its 71-page Complaint in state court.  JA29-104.  On December 18, 2014, Defendants removed the case to federal court.  JA23-26.  On December 29, 2015, the District Court declined to remand the case to state court and abstain from exercising jurisdiction.  JA154-62.

Shortly thereafter, on January 2, 2015, the Commission filed a Rule 12(b)(6) motion, challenging the sufficiency of the Complaint and asserting that Defendants' actions had no legal effect and were not subject to judicial review.  *See* Mem. Supp. Mot. Dismiss at 19-21 (ECF No. 19-1).  On July 17, 2015, the District Court denied the motion and rejected the Commission's attempt to render itself unreviewable.  JA130-35.  The Commission reasserted the same positions in a motion for reconsideration, which the District Court also denied.  JA155-58.

Then, on April 13, 2017, thirty months into the case and in the midst of discovery, Defendants made yet a third challenge to the sufficiency of the Complaint.  JA190-97, JA383-87.  In support of their Rule 12(c) Motions challenging the sufficiency of the Complaint, Defendants attached hundreds of pages of extraneous exhibits as proof of the legislation's rational basis.  *See generally* JA241-382, JA523-686.

On August 25, 2017, the District Court granted Defendants' Motions and dismissed Pulte's claims. JA687-708. At the outset, the Court noted, it was free to consider Defendants' exhibits attached to the Motions. JA692-94. With that in mind, the Court held that Pulte could not support its due process or Article 19 claims because it had no protected property interest, and in any event, the text of the Master Plan Amendment proved that the Amendment had a rational basis. JA695-700, JA706-07. The District Court held that Pulte's equal protection claim failed for the latter reason as well—the Amendment was rational because the Amendment said so. JA700-02. The Court likewise ruled that Pulte could not sustain a takings claim, even at the pleadings stage, because the Court believed Pulte's purchases were speculative, Defendants' actions had not sufficiently decreased the property's value, and Defendants' actions amounted to routine land use regulation. JA702-06. On the Rule 12(c) Motions, the District Court considered and weighed evidence, drew inferences against Pulte, and dismissed all claims without giving Pulte an opportunity to challenge the evidence or to amend its Complaint. *See generally* JA687-708.

On September 21, 2017, Pulte timely filed its Notice of Appeal. JA813-16.

## SUMMARY OF THE ARGUMENT

The Complaint paints a detailed portrait of a local government arbitrarily and irrationally singling out one land developer for negative treatment. But instead of looking to and crediting the Complaint, as a district court must do when faced with a Rule 12(c) motion, the District Court all but ignored the allegations and considered evidence outside the Complaint. It weighed the evidence proffered by Defendants to justify their actions. In so doing, the District Court misapprehended its role in reviewing a Rule 12 motion.

First, the District Court erroneously considered and heavily relied on documents outside of the Complaint. The documents should not have been considered in the first place. But even if they could be considered, the District Court was wrong to weigh and credit the self-serving statements in those documents over those in the Complaint at the pleadings stage.

Second, the District Court prematurely dismissed Pulte's equal protection, takings, due process, and Article 19 claims. While each claim has its own peculiarities, the District Court's errors fall into three categories: (a) the District Court failed to recognize the factual nature of the dispositive questions; (b) the District Court misinterpreted the relevant law regarding the dispositive questions; and (c) the District Court erroneously construed the pleadings in the light most favorable to the movants in resolving factual and legal questions.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews de novo orders granting motions for judgment on the pleadings under Rule 12(c).  *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).  This Court reviews Rule 12(c) motions in the same manner as motions to dismiss for failure to state a claim under Rule 12(b)(6).  *Id.*

Thus, to survive a motion for judgment on the pleadings, the complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  This is a "plausibility" requirement, not a "probability requirement."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).  A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Id.* at 556 (internal quotation marks omitted).

In determining whether a complaint satisfies Rule 12(c), courts test "only the sufficiency of the complaint and do[] not resolve the merits of the plaintiff's claims or any disputes of fact."  *Drager*, 741 F.3d at 474.  That is, courts review only the complaint's "plausibility," rather than "the ultimate truth of its allegations."  *In re GNC Corp.*, 789 F.3d 505, 517 (4th Cir. 2015).  In short, courts may not discern

and resolve issues of fact on a Rule 12 motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir.1999).

In sum, "a motion for judgment on the pleadings should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove *any* set of facts in support of his claim entitling him to relief." *Drager*, 741 F.3d at 474 (internal quotation marks omitted) (emphasis added). When this standard is not met, "a summary judgment motion or a full trial is necessary." 5C Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1368.

## II.    IN GRANTING THE RULE 12(C) MOTIONS, THE DISTRICT COURT ERRED IN CONSIDERING, RELYING UPON, AND CREDITING AS TRUE DOCUMENTS OUTSIDE THE COMPLAINT.

On a Rule 12 motion, a court is "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). In other words, "as a general rule extrinsic evidence should not be considered" at the Rule 12 stage. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

Here, the District Court impermissibly considered the Master Plan Amendment in adjudicating Defendants' Motions. In so doing, the District Court made two errors: (1) the Court wrongly concluded that the Amendment was

13

integral to the Complaint, and (2) the Court credited as true the putative rationale Defendants provided in the Amendment even when directly contradicted by the Complaint.  Tellingly, the District Court's analysis of Pulte's claims hardly mentions the Complaint at all.  JA694-707.  Indeed, in determining that Defendants acted rationally, the Court repeatedly cited to the Amendment, while making only one (dismissive) reference to the Complaint.  JA699-700.  This amounts to weighing of evidence, effectively turning the Motions into motions for summary judgment without notice or the opportunity for Pulte to present evidence supporting its claims.

### A.    The Master Plan Amendment is Not Integral to the Complaint.

Courts should not consider documents attached to Rule 12 motions unless the document is "integral to and explicitly relied on in the complaint," and "the plaintiffs do not challenge the document's authenticity."  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-607 (4th Cir. 2015) (internal quotation marks omitted).  This exception applies *only* when "the complaint relies *heavily* upon" both the document's "terms" *and* the document's "effect."  *Goines*, 822 F.3d at 166 (internal quotation marks omitted) (emphasis added).

The reliance must be significant:  an "integral document" is one that "by its 'very existence, and *not the mere information it contains*, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*,

794 F. Supp. 2d 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)). "Limited quotation from or reference to documents that may constitute relevant evidence in a case," therefore, do not suffice to incorporate extraneous documents "wholesale, into the complaint." *Goines*, 822 F.3d at 166 (internal quotation marks omitted); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (holding that the standard is not met by "[m]erely mentioning a document in the complaint").

"In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls[.]" *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). In these cases, "the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim." *Id.* That is why such documents are often not attached to the Complaint. *See id.*

These cases also have another prominent feature: the document gives rise to substantive rights that can be analyzed within the four corners of the extraneous document. *See id.* For example, a "contract is 'integral' to the plaintiff's claim" in a breach of contract action because it "is a legally operative document that is a necessary element of the claim"—"it 'form[s] the basis for a claim or part of a claim.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (quoting *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004)).

Here, the Amendment is not an integral document. The Complaint neither quotes nor relies upon the terms of the Amendment whatsoever. *See generally* JA29-104. To the contrary, Pulte actively disputes the veracity of the Amendment, specifically attacking the false and self-serving justifications on the face of the Amendment. *See, e.g.,* JA76-77. One of the Complaint's primary allegations is that Defendants knew, but disregarded, that Pulte's residential development would actually improve the water quality through the use of advanced ESD techniques. JA55-57, JA71-73. These factual allegations must be accepted as true at the pleadings stage. *See Drager*, 741 F.3d at 474. Pulte further alleges that the Amendment did not actually seek to protect the environment; rather, the Amendment irrationally targeted Pulte, and Pulte alone, to stop its development without any reasonable evidence. JA66-67, JA75-77, JA79-81. Far from relying on the Amendment, the Complaint actively undermines it.

By contrast, Pulte *does* quote extensively from other documents, like its detailed correspondence with Defendants, in the Complaint. *See generally* JA41-81. The critical difference is that Pulte does not contest the veracity of the allegations in these documents, while it contends that the Amendment's assertions and putative rationale are false. *See, e.g.*, JA59-61.

Moreover, Pulte's rights do not arise out of the Amendment. Pulte's rights primarily arise from the U.S. and Maryland Constitutions and not the Amendment.

16

In other words, the facts at issue and in dispute are whether Defendants' actions were arbitrary and capricious and whether the stated rationale in the Amendment is false.

Because Pulte's claims do not rise and fall based on the terms of the Amendment itself and because the Amendment is a unilateral document, drafted solely by Defendants, this case differs from the aforementioned typical breach of contract cases. In those cases, the four corners of the contract define the dispute, and it may be appropriate to consider the contract to determine whether it can support the construction alleged in the complaint. *Accord Am. Chiropractic Ass'n*, 367 F.3d at 234. But here, the terms of the Amendment simply present extraneous detail, and any dispute over those terms is not over their construction but over whether they are supported by a rational basis and evidence.

Even the cases cited by the District Court in support of its decision fall into the classic category of contract disputes, not constitutional challenges or challenges to rationale. *See* JA692-93 (citing *Am. Chiropractic Ass'n*, 367 F.3d at 234; *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998)). In *Parrino*, an ERISA case, the Ninth Circuit held that a master group application was integral because the plaintiff's claims rested on his "membership" in the plan and the "terms" of the plan. 146 F.3d at 706. Similarly, in *American Chiropractic*, this Court held that a contract

was integral to a complaint alleging fraud claims "based on the alleged misrepresentation[s]" within the contract.  367 F.3d at 234.  Likewise, in *Phillips*, this Court concluded that a letter containing a purported misstatement was integral to a securities fraud action grounded in that very misstatement.  190 F.3d at 618.

In sum, Pulte is challenging the stated rationale in the Amendment. Accordingly, the District Court erred in treating the Amendment as an integral document, akin to a contract, and considering it in deciding the Rule 12(c) Motions.

### B.    The District Court Erred in Treating the Contents of the Master Plan Amendment as True.

On a Rule 12 motion, if a party references or attaches a document and does so "for purposes other than the truthfulness of the document, *it is inappropriate to treat the contents of that document as true*."  *Goines*, 822 F.3d at 167 (emphasis added).  As Judge Posner once put it:  while the "fantastic argument" that "*all* facts contained in *any* attachment to a complaint are automatically deemed facts alleged in the complaint" would "do wonders for [the Court's] workload, [it] is beyond nonsensical."  *Carroll*, 362 F.3d at 986.  This is consistent with the Rule 12 standard, which requires that a court accept plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in plaintiff's favor.  *See Drager*, 741 F.3d at 474.

If "attached documents were always treated as if their contents were adopted by the plaintiff," for example, "a libel plaintiff would plead himself out of court simply by attaching the libelous writing to his complaint." *Goines*, 822 F.3d at 167. For the same reason, "if a prisoner attaches an unfavorable decision from a prison tribunal to show that he has exhausted his administrative remedies, he does not thereby adopt the factual findings of that unfavorable decision." *Id.*

This is particularly true with respect to unilaterally prepared documents. *See id.* at 168. As this Court explained, such unilateral documents "may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Id.* Especially in the preliminary motions context, treating a unilateral "document as true simply because it was attached to or relied upon in the complaint . . . would be 'contrary to the concept of notice pleading' and 'would enable parties to hide behind untested, self-serving assertions.'" *Id.* (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 456 (7th Cir. 1998)).

This Court's decision in *Goines* perfectly lays out the issue. Assuming, without deciding, that a police report was integral to the plaintiff's § 1983 claim of unlawful seizure, the Court explained that the plaintiff did not "adopt" it "as true simply by relying on [it] for some of the facts alleged in his complaint." *Id.* The plaintiff's "purpose," the Court explained, "was not to assert the truthfulness of the

statements" in the report "but instead to illustrate the mistakes he believed were made by the Officers." *Id.* Therefore, this Court reversed the order treating the report's statements as true. *Id.* at 168-69.

In *Northern Indiana*, the Seventh Circuit reached a similar conclusion, reversing the dismissal of a complaint that challenged the constitutionality of a no-gun policy because the district court "credit[ed] the unilateral statements" regarding safety in defendants' policy materials "over the allegations in [plaintiff's] complaint." 163 F.3d at 450-51.

The District Court's error in this case is indistinguishable from those in *Goines* and *Northern Indiana*. Like the report in *Goines* and the materials in *Northern Indiana*, the Amendment is *related* to Pulte's claims, but it does not serve as the *basis* for the cause of action. Like the allegations in the complaints in *Goines* and *Northern Indiana*, the Complaint's allegations in this case *directly contradict* the statements in the Amendment. Finally, like the defendants in *Goines* and *Northern Indiana*, Defendants in this case prepared the Amendment in a self-serving, one-sided manner. Thus, it was improper for the Court to credit the statements in the Amendment. *See* JA75-77, JA79-81.

After wrongly concluding that the Amendment was integral to the Complaint, the District Court failed to consider the actual purpose of the Amendment and why it was referenced in Complaint. For example, the District

Court observed that the Amendment was "similar to" an "allegedly libelous magazine article in a libel action," JA694; however, the Court failed to consider the distinction between considering the fact of the article's existence and *crediting the article's contents*. JA693-94. This distinction is not an academic one. Courts are well within the limits of Rule 12 to dismiss libel actions that falsely plead the existence of a libelous statement that does not exist. But courts may not dismiss libel actions at the pleadings stage because they read the allegedly libelous statement in the context of the greater article and decide that the article is more persuasive or credible than the complaint. The latter scenario shifts a massive burden onto the plaintiff in a manner totally at odds with Rule 12. The District Court improperly disregarded the allegations in the Complaint in favor of the statements in the Amendment. Essentially, under the District Court's approach, no party challenging legislation could survive the pleadings stage where the legislature includes a putative justification in the legislation's text.

## III. THE DISTRICT COURT ERRED IN DISMISSING PULTE'S EQUAL PROTECTION CLAIM.

The Equal Protection Clause prohibits the government from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause seeks "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination[.]" *Willis v. Town of*

21

*Marshall*, 426 F.3d 251, 263 (4th Cir. 2005) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

As a result, the Equal Protection Clause authorizes so-called "class of one" claims. *Id*. To state a "class of one claim," the plaintiff must allege (1) "that she has been intentionally treated differently from others similarly situated" and (2) that the "difference in treatment" lacks a rational basis, *i.e*., is not rationally related to a legitimate state interest. *Id*. (quoting *Olech*, 528 U.S. at 564). Here, only the second element is in question. *See* JA700 (noting Defendants' admission that Pulte was intentionally treated differently from similarly situated persons); *see also* JA733 (when asked if Defendants "concede that [Plaintiffs] were, in fact, treated differently," Defendants' counsel responded affirmatively).

The second element has two components. *See Zobel v. Williams*, 457 U.S. 55, 61-64 (1982). First, the "objective" or "purpose" of the statute's classification must be "legitimate." *Id*. Second, the statute's classification must be "rationally related" to that purpose or objective. *Id.*

With regard to rational basis, in their Rule 12(c) Motions, Defendants claim they treated Pulte's property differently from other similarly situated properties to "protect[ ] . . . the Ten Mile Creek watershed." JA232. Merely providing a rationale, however, is not enough to defeat a class of one claim at the pleadings stage.

In *Zobel*, the Supreme Court struck down an Alaska natural resource dividend distribution plan, which distributed payments to Alaska citizens in varying amounts based on the length of the citizen's residence in the state. 457 U.S. at 56. Alaska's rationale for the plan was that it both created a financial incentive to establish and maintain residence in Alaska and encouraged prudent management of the fund. *Id.* at 61. The Court, however, held that the plan was not rationally related to either interest. *Id.* at 61-64. Focusing on the classifications created as between residents over the *previous* 21 years, the Court held that the plan did nothing to encourage *future* citizens to establish or maintain residence in Alaska or prudently manage the fund *in the future*. *Id.* at 61-65. In sum, merely asserting that an interest is legitimate does not satisfy rational basis review; rather, the government's classification must be rationally related to that legitimate interest. *See id.*

Here, Pulte alleged that Defendants' discriminatory land use actions were not rationally related to protecting the Ten Mile Creek watershed. In concluding otherwise, the District Court made two errors. First, the court construed the question as one of law, when it is one of fact. Second, the court overlooked the Complaint, which explains (in detail) that Defendants' discriminatory conduct was not rationally related to protecting the Ten Mile Creek watershed. *See, e.g.,* JA85-88.

### A.    Whether Government Discrimination is Rationally Related to a Legitimate Interest Is a Question of Fact.

The Supreme Court has long recognized that the question of whether government action is rationally related to a legitimate state interest is a question of fact. *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 449-50 (1985); *Plyler v. Doe*, 457 U.S. 202, 228-30 (1982).

In *Cleburne*, the Court struck down a zoning ordinance requiring a special use permit to construct group homes for those with mental disabilities, but not for other groups, and repeatedly emphasized the lack of evidence justifying the ordinance. 473 U.S. at 449-50. For example, those defending the ordinance cited concerns "with the size of the home and the number of people that would occupy it." *Id.* at 449. But the Court found no evidence to support this concern:

> At least this record does not clarify how, in this connection, the characteristics of the intended occupants of the . . . home rationally justify denying to those occupants what would be permitted to groups occupying the same site for different purposes. Those who would live in the . . . home are the type of individuals who, with supporting staff, satisfy federal and state standards for group housing in the community; and there is no dispute that the home would meet the federal square-footage-per-resident requirement[.]

*Id.* at 450.

Again, in *Plyler*, the Supreme Court stressed the lack of evidence to support a Texas law withholding funds for the education of illegal immigrants from public schools and authorizing school districts to deny such immigrants admission. 457

24

U.S. at 228-30.   When Texas claimed an interest in protecting itself from the negative economic impacts of illegal immigration, the Court balked:

> There is no evidence in the record suggesting that illegal entrants impose any significant burden on the State's economy.   To the contrary, the available evidence suggests that illegal aliens underutilize public services, while contributing their labor to the local economy and tax money to the state fisc.

*Id.* at 228.   In almost identical fashion, the Supreme Court also rejected Texas's claimed interest in reducing education expenditures to improve overall educational quality. *Id.* at 229.

Following *Cleburne* and *Plyler*, this Court recognized the factual nature of determining whether legislation is *rationally related* to a legitimate state interest at the pleadings stage:  "To survive a motion to dismiss for failure to state a claim, a plaintiff must allege *facts* sufficient to overcome the presumption of rationality that applies to government classifications."  *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008) (internal quotation marks omitted) (emphasis added); *accord* Timothy Sandefur, *Rational Basis & the 12(B)(6) Motion:   An Unnecessary "Perplexity"*, 25 Geo. Mason U. Civ. Rts. L.J. 43, 45 (2014) (surveying the case law and concluding that "the better understanding of rational basis . . . views the test as an evidentiary presumption, not a conclusive presumption or rule of law"). The "rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard."  *Giarratano*, 521 F.3d at 303.

25

Here, Pulte sufficiently pleaded that there was no rational basis for treating it differently from other property owners in the Ten Mile Creek watershed. The Court nonetheless concluded, as a matter of law, that Defendants' discrimination was rationally related to "reduc[ing] the impact of development on water quality." JA701-02 (internal quotation marks omitted). But it is not up to the District Court to weigh the evidence and decide the case at the pleadings stage. Like in *Cleburne* and *Plyler*, the existence or nonexistence of facts supporting a rational relationship between means and ends will determine whether Pulte's claim has merit. It was far too early for the District Court's bald conclusion, made without an evidentiary record, that this "is undoubtedly a rational classification[.]" *See* JA702.

## B. The Allegations in the Complaint State an Equal Protection Claim.

The relevant question in adjudicating a Rule 12(c) motion in this context is whether a plaintiff alleges "facts sufficient to overcome the presumption of rationality that applies to government classifications." *Giarratano*, 521 F.3d at 304 (internal quotation marks omitted).

The Supreme Court has reversed dismissal of equal protection claims at the pleading stage. *See Polk Co. v. Glover*, 305 U.S. 5, 9-10 (1938); *Borden's Farm Prods. Co. v. Baldwin*, 293 U.S. 194, 209 (1934). In *Borden's Farm*, the Court reversed the dismissal of a challenge to a government interpretation that fixed the minimum price of milk in a way that imposed a one-cent-per-quart differential "in

favor of dealers not having a 'well advertised trade name.'"  293 U.S. at 200, 213. The Supreme Court rejected the government's attempt to defend the law through the introduction of "various tables and statements in the reports of the legislative committee," instead concluding that such facts are "properly the subject of evidence and findings," and deserve the benefit of discovery.  *Id.* at 208, 210.

The Court reached a similar decision in *Polk*, permitting a challenge to a Florida citrus fruit and juice labeling requirement to proceed beyond the pleadings stage.  305 U.S. at 9-10.  In doing so, the Court remarked that the "salutary principle that the essential facts should be determined before passing upon grave constitutional questions is applicable."  *Id.* at 10.

Subsequent to *Polk* and *Borden's Farm*, the Seventh Circuit reversed the dismissal of an equal protection claim at the pleadings stage even while acknowledging that the "defendants may be able to justify their seemingly discriminatory treatment."  *Keenon v. Conlisk*, 507 F.2d 1259, 1261 (7th Cir. 1974).  The Seventh Circuit held that the district court "could not" have held that a police department practice of transporting all female arrestees to central police headquarters satisfied rational basis review "without accepting [the] defendants' assertions as fact."  *Id.*

In the land use context, other circuits have not been afraid to reverse district courts for prematurely dismissing rational basis equal protection claims.  *See, e.g.,*

*Exec. 100, Inc. v. Martin Cty.*, 922 F.2d 1536, 1541 (11th Cir. 1991) (reversing dismissal of equal protection claim based on denial of request for zoning change because requests from two other parcels had been granted); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508-09 (9th Cir. 1990) (reversing grant of summary judgment where city purportedly denied plaintiff application to develop in order to save butterfly habitat, yet had granted plaintiff's neighbors' prior applications to do same). In at least one case, the Sixth Circuit reversed a grant of summary judgment and invalidated local zoning laws. *See Berger v. City of Mayfield Heights*, 154 F.3d 621, 623-26 (6th Cir. 1998).[1]

Pulte's Complaint sufficiently states an equal protection claim by alleging that Defendants' classification was not rationally related to a legitimate government interest. The Complaint alleges that the "conclusions and recommendations relative to the Master Plan Amendment" are "*not substantiated* by the evidence and findings." JA55 (emphasis added). More specifically, the Complaint alleges that the "environmental/engineering analyses relied upon to support" the Commission's "recommendations regarding supposedly necessary

---

[1] Outside of the land use context, this Court's sister circuits also have struck down legislation for want of a rational basis. *See, e.g., St. Joseph Abbey v. Castille*, 712 F.3d 215, 223-27 (5th Cir. 2013) (striking down statute granting funeral homes an exclusive right to sell caskets); *Merrifield v. Lockyer*, 547 F.3d 978, 988-92 (9th Cir. 2008) (striking down interpretation and enforcement of state licensing system that applied to pest controllers who targeted rodents and pigeons, while exempting controllers who targeted other pests).

down-zoning and/or unreasonably low impervious caps are based on *faulty analysis, assumptions and arguments* regarding both the supposed 'existing conditions' of Ten Mile Creek, as well as various *untenable* impact projections" regarding Ten Mile Creek.  JA56 (emphases added).  Indeed, the Complaint states that these studies were "*speciously designed*—even perhaps to intentionally exaggerate and misapply the supposedly supporting data."  JA58 (emphasis added).  Taken together, these allegations make clear that Defendants treated Pulte "in a vastly different manner than other properties in the Ten Mile Creek Area," without "justification in the record."  JA76.  This is more than sufficient to rebut any presumption of validity and properly allege that there was no rational basis for the classification.

Even considering the text of the Master Plan Amendment, this Court should rule in Pulte's favor because the Complaint contradicts the Amendment.  As an example, the Complaint alleges that the evidence referenced in the Amendment is "without justification in the record," "[w]ithout legitimate justification as borne out by the facts," "not based on defensible scientific grounds," and "untenable."  JA58, JA75-77.  At the pleadings stage, the District Court must credit Pulte's factual allegations as true and draw inferences in Pulte's favor, instead of weighing the evidence and concluding that a rational basis exists for the Amendment.  *Accord Polk*, 305 U.S. at 9-10; *Borden's Farm*, 293 U.S. at 209.

If this were not the case, rational basis review would be a sham. Legislatures could avoid judicial scrutiny merely by asserting a facially conceivable rationale in the text of the legislation. No matter how unreasonable (or untrue) the rationale, plaintiffs would be helpless to challenge deprivations of their rights because district courts would be constrained to the text and the text alone. In this way, the District Court's approach amounts to no review at all.

Supreme Court precedent makes clear that rational basis review is not a rubber stamp review. Accordingly, the District Court erred in concluding on the Rule 12(c) Motions that a rational basis existed for Defendants' actions.

## IV. THE DISTRICT COURT ERRED IN DISMISSING PULTE'S TAKINGS CLAIM.

Under the Fifth Amendment, "private property" may not be "taken for public use, without just compensation." U.S. Const. amend. V. For "the most part," the Supreme Court refrains "from elaborating this principle through definitive rules." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). Instead, the Court sticks by a longstanding mantra: "if the regulation *goes too far* it will be recognized as a taking." *Id.* (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)) (emphasis added).

Courts determine whether a regulation "goes too far" by assessing "a complex [set] of factors," first delineated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). *Palazzolo v. Rhode Island*, 533 U.S.

606, 617 (2001). The *Penn Central* factors include: (1) the regulation's "economic effect" on the property-owner; (2) the extent of its interference with "reasonable investment-based expectations"; and (3) the "character of the governmental action." *Id*. In analyzing *Penn Central*'s factors, courts "must be driven by the purpose of the Takings Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Murr*, 137 S. Ct. at 1943 (internal quotation marks omitted).

### A. Takings Claims Turn on a Fact-Intensive Analysis.

Takings cases are "characterized by ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Id.* at 1942 (internal quotation marks omitted). While the Supreme Court has "drawn some bright lines . . . takings claims turn on situation-specific factual inquiries." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31-32 (2012). There "simply is no bright line dividing compensable from noncompensable exercises of the Government's power." *Cienega Gardens v. United States*, 503 F.3d 1266, 1278 (Fed. Cir. 2007) (internal quotation marks omitted). Because takings cases are fact-specific, motions to dismiss takings claims "must be viewed with particular skepticism." *Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir. 1989).

In fact, this Court has warned that Supreme Court precedent "raise[s] questions about the propriety of *summary judgment* of takings claims without a fully developed factual record." *Naegele Outdoor Advert., Inc. v. City of Durham*, 844 F.2d 172, 175 (4th Cir. 1988) (emphasis added). Stated differently, the "fact-intensive nature of just compensation jurisprudence . . . argues against precipitous grants of summary judgment." *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983).

In *Naegele*, this Court reversed a grant of summary judgment dismissing a partial takings claim, which challenged an ordinance restricting the placement of billboards. 844 F.2d at 176. The Court held that the "dispute about the impact of the ordinance on Naegele's business require[d] a *full evidentiary hearing*." *Id.* (emphasis added). The relevant "ad hoc inquiries," the Court continued, "must be considered with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Id.* at 177 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987)).

Not two years later, this Court again reversed the grant of summary judgment on a partial takings claim. *See Ga. Outdoor Advert., Inc. v. City of Waynesville*, 900 F.2d 783, 789 (4th Cir. 1990). For a second time, this Court

stressed that it "is only after a detailed factual examination . . . that a court in the ordinary case properly should ascertain whether a regulation effects a taking." *Id.*

The District Court failed to acknowledge this before engaging in a rigid legal analysis as to each *Penn Central* factor without the benefit of a detailed factual record.  First, the Court wrongly concluded that an 83% percent diminution in property value constituted insufficient economic impact *per se* under *Penn Central*.  JA704.  Second, the Court improperly held that when a defendant has "significant discretion to apply zoning restrictions," a developer's expectations are reasonable "*only* if the defendant's interpretation [i]s clearly erroneous."  JA704-05 (internal quotation marks omitted).  Third, the Court stated that regulations that "control development based on density and other traditional zoning concerns" are not of a "character" to warrant scrutiny under *Penn Central*.  *See* JA705 (internal quotation marks omitted).  Nearly a century of consistent Supreme Court precedent makes clear that such rigid legal application is inappropriate in takings cases.  *See, e.g., Murr*, 137 S. Ct. at 1950 ("[T]he ultimate question whether a regulation has gone too far . . . cannot be solved by any simple test."); *Pa. Coal*, 260 U.S. at 416 ("[T]his is a question of degree—and therefore cannot be disposed of by general propositions.").

**B.     The District Court Disregarded the Relevant Precedent.**

As to each *Penn Central* factor, the District Court overstated Pulte's burden, especially for the purposes of testing the sufficiency of the allegations in the Complaint.  With respect to "economic impact," the District Court made multiple legal errors.   First, there is no "automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value."  *Cienega Gardens v. United States*, 331 F.3d 1319, 1340 (Fed. Cir. 2003) (internal quotation marks omitted).  If "a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest."  *Palazzolo*, 533 U.S. at 631.  Second, "a total diminution of 83%" *is* "in the range" that courts have found *sufficient* to constitute a taking under *Penn Central*.  *Contra* JA704 *with Yancey v. United States*, 915 F.2d 1534, 1539-42 (Fed. Cir. 1990) (affirming finding that a compensable taking had occurred with 77% diminution in value); *Fla. Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21, 43 (1999) (finding compensable taking with 73.1% diminution in value); *see also Cienega Gardens*, 331 F.3d at 1343 n.40 (observing that even a mere 35% diminution in value was a "non-trivial diminution").

Likewise, without the benefit of a factual record, the District Court wrongly narrowed the range of "distinct investment-backed expectations" entitled to

protection under the Takings Clause.  JA704-05.  By way of example, in *Palazzolo*, the Supreme Court held that property-owners were not barred from challenging pre-purchase regulations under the Takings Clause simply because they had notice of the regulation when they purchased the property.  533 U.S. at 626-28.  The State, remarked the Court, "may not put so potent a Hobbesian stick into the Lockean bundle."  *Id.* at 627.

Yet under the District Court's standard, a government can dodge *Penn Central* so long as it retains "significant discretion" to change the law and its subsequent exercise of that discretion is not "clearly erroneous."  JA704-05.  This elevates formalism over facts, disregarding issues like whether the claimant operated in a highly regulated industry or the regulation's legislative history, which are often crucial in assessing claimants' expectations.  *See, e.g., Chancellor Manor v. United States*, 331 F.3d 891, 906 (Fed. Cir. 2003) (reversing grant of summary judgment dismissing takings claim and holding that court should consider "contemporaneous publications and private placement memoranda, the legislative history of the various statutes, and past actions taken with respect to other federally subsidized housing programs"); *U.S. Fidelity & Guar. Co. v. McKeithen*, 226 F.3d 412, 418-19 (5th Cir. 2000) (reversing grant of summary judgment dismissing takings claim and holding that there was no "pattern of conduct on the state's part

that could have given the plaintiffs sufficient notice" of the impending regulatory change).

Finally, in analyzing the "character" of Defendants' actions, the District Court neglected to consider critical components of "character," opting instead for an illusory two-part test. First, the court did not consider "whether the party seeking compensation has created or contributed to the problem the government seeks to solve." *Contra* JA705 *with Chancellor Manor*, 331 F.3d at 905 (citing *E. Enters. v. Apfel*, 524 U.S. 498 (1998)). Second, the court did not consider whether the legislation serves the public interest. *Contra* JA705 *with Maritrans Inc. v. United States*, 342 F.3d 1344, 1356 (Fed. Cir. 2003) (holding that courts must "consider the purpose and importance of the public interest underlying a regulatory imposition"). Instead, the District Court incorrectly asked: (1) does the regulation amount to a physical invasion and (2) does the regulation *facially appear* to regulate traditional land use concerns? JA705.[2] The former is irrelevant to *Penn Central*—permanent physical invasions constitute *per se* takings. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982) (observing that *Penn Central* "does not repudiate" the rule that physical invasions constitute takings "without regard to other factors that a court might ordinarily examine"). The latter, when applied at the pleadings stage, reduces the "character of the

---

[2] The Complaint does not allege a physical taking or mount a facial attack. *See* JA88-89.

action" factor to a facial evaluation, absolving all but the legislature that confesses its taking in text.

Ultimately, takings cases "should be assessed with reference to the particular circumstances of each case, and not by resorting to blanket exclusionary rules." *Ark. Game*, 568 U.S. at 37 (internal quotation marks omitted).

### C.     The District Court Erroneously Construed the Pleadings in the Light Most Favorable to the Moving Party.

The District Court also erred by (a) reading certain allegations in *Defendants'* favor and (b) ignoring other allegations in the Complaint and not treating them as true.

With respect to the regulation's economic impact, the District Court centered exclusively on Pulte's statement that Pulte "can now develop no more than 17 percent of its property, approximately 93 of its approximately 541 acres." JA704 (internal quotation marks omitted). The District Court apparently took this to mean that Pulte alleged a *maximum* diminution in value of 83%. *See id.* But construed in the light most favorable to Pulte, the non-movant, the Complaint provides that 83% is the *floor* for the *amount of totally undevelopable property*. It does not mean that 83% is the *ceiling* for Pulte's *diminution in value*.

Moreover, the District Court focused solely on this numerical value to the exclusion of all other alleged economic-impact takings. Pulte alleges that Defendants inflicted a total temporary economic taking through their *de facto*,

multi-year water-sewer moratorium. JA88; *accord First English Evangelical Lutheran Church v. Cty. of Los Angeles*, 482 U.S. 304, 322 (1987) (holding that total temporary economic taking was compensable under Fifth Amendment). And Pulte alleges that Defendants imposed unique, affirmative obligations, like the crushing parkland dedication and conservation management plan requirements. *See* JA89; *accord Dolan v. City of Tigard*, 512 U.S. 374, 390-91 (1994). Properly considered, Pulte alleged compensable economic impacts.

The District Court made the same two mistakes in judging the extent of Defendants' interference with Pulte's distinct investment-backed expectations. The District Court observed that "Pulte knew that any development was dependent on receiving approval for sewer and water[.]" JA705. This is not in the Complaint. Furthermore, the District Court explained that such approval could be "defer[red] . . . pending further study or consideration as deemed necessary and appropriate by the Council." *Id.* (internal quotation marks omitted). This is also not in the Complaint. Here too, Pulte repeatedly alleged that the Master Plan's detailed set of criteria restricted any such discretion, which the District Court ignored. *See* JA37-38, JA56, JA84, JA93, JA705. In addition, the District Court did not recognize the allegations of interference inflicted by newly imposed *exactions*. *Contra* JA705 *with City of Annapolis v. Waterman*, 745 A.2d 1000,

1016 (Md. 2000) (observing that taking occurred when "landowner was compelled to expend substantial private resources to serve the public good").

Finally, the District Court construed the character of Defendants' regulatory actions in a manner inconsistent with the Complaint.  The District Court's observation that Defendants' actions are a "reasonable land-use regulation" does not come from the Complaint.  JA705.  In the first three pages of the Complaint alone, Pulte alleges that Defendants "singled out and targeted the subject property with extraordinary land use exactions," had "no valid scientific support" for their actions, "ignor[ed] expert testimony," and were "not [engaged in] an exercise of judgment on proper land use planning and zoning."  JA29-31; *accord Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014).  Overall, the District Court failed to recognize that the burden for purportedly advancing the region's environmental interests should not rest upon Pulte alone.  Pulte adequately pleaded a *Penn Central* takings claim.

## V.    THE DISTRICT COURT ERRED IN HOLDING THAT PULTE FAILED TO ALLEGE THE DEPRIVATION OF A CONSTITUTIONALLY PROTECTED PROPERTY INTEREST.

The government may not deprive "any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  To state a due process claim, plaintiffs must allege that they "had a constitutionally cognizable life,

liberty, or property interest," and that the defendants deprived them of such an interest. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).

Here, Defendants deprived Pulte of protected property interests in (1) its right to develop, which vested through its acquisition and recordation of TDRs; (2) its right to use its property in a manner consistent with three decades of state and local law; and (3) its right to appropriate consideration of its water and sewer reclassification request. In addition, Defendants deprived Pulte of its protected property interest in its TDRs, in and of themselves.

### A.    Pulte Possesses Constitutionally Protected Property Interests.

To have a "property interest in a benefit," a person must have "a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Such "[p]roperty interests . . . are not created by the Constitution," but "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

Property is "not limited by a few rigid technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972). Indeed, "policies and practices," though not explicit, "may supplement" written rules with a sort of "unwritten 'common law'" and thereby create a protected property interest. *Id.* at 602-03.

Ultimately, "'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'" *Id.* at 601 (quoting *Roth*, 408 U.S. at 577).

> **1.    Pulte had a vested property interest in the County's preexisting zoning when it purchased property, designated as a TDR-receiving area, and then purchased TDRs and recorded them.**

As explained in *Roth* and *Perry*, this Court generally looks to state law to determine whether a party possesses a protected property interest. *A Helping Hand, LLC v. Baltimore Cty.*, 515 F.3d 356, 370 (4th Cir. 2008). Under Maryland law, parties have a property interest in existing zoning when they have a "vested right," which traditionally requires two things: (1) "a permit" and (2) exercising the permit "so that the neighborhood may be advised that the land is being devoted to that use." *Id.* at 370-71 (quoting *Powell v. Calvert Cty.*, 795 A.2d 96, 102 (Md. 2002)).

Recently, Maryland courts have expanded the range of vested rights that protect parties from sudden changes in the law. *See, e.g., Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, No. 13, Sept. Term, 2017, 2017 WL 5507725, at *17-20 (Md. Nov. 17, 2017); *Md. Reclamation Assocs. v. Harford Cty.*, 994 A.2d 842, 874-75 (Md. 2010); *Frall Developers, Inc. v. Bd. of Cty. Comm'rs for Frederick Cty.*, No. CCB-07-2731, 2008 WL 4533910, at *12-13 (D. Md. Sept. 30, 2008); *Nat'l Waste Managers, Inc. v. Anne Arundel Cty.*, 763 A.2d 264, 277 (Md. Ct. Spec. App. 2000). In *National Waste Managers*, the Court of Special Appeals

held that a rubble landfill operator had a vested right in a special exception such that the county could not willfully delay processing the operator's permit request in order to ensure its expiration.  763 A.2d at 277.  In *Frall*, Chief Judge Blake of the District of Maryland ruled that a letter of understanding with a county planning commission could serve as the basis for a constitutionally protected property interest grounded in the terms of the letter.  2008 WL 4533910, at *12-13.  In *Maryland Reclamation*, the Court of Appeals "stop[ped] short of adopting zoning estoppel" because the record did not support it but acknowledged that "there may be situations in which the developer's good faith reliance on government action in the pre-construction stage is so extensive and expensive that zoning estoppel is the appropriate doctrine to apply."  994 A.2d at 875.  And in *Blentlinger*, the Maryland Court of Appeals recognized that Maryland sought "to solve the vesting problem," by legalizing development rights and responsibilities agreements ("DRRAs"), so that developers could obtain vested rights absent a permit and a shovel in the ground, avoiding the often harsh and unpredictable results associated with the traditional vested rights doctrine.  2017 WL 5507725, at *17 (internal quotation marks omitted).

The same logic applies here:  through its "long-touted" TDR program, the County expressly authorized Pulte to develop.  Pulte's acquisition, recordation, and presentation of its TDRs in many ways resemble the traditional permit process.

Like one who obtains a permit, one who purchases a TDR has a legislatively created license to develop in a particular manner. *See* Montgomery Cty. Md. Code, Art. 59-A (2004) (defining "Transfer of Development Rights"). Like one who puts a shovel in the ground so that "the neighborhood may be advised that the land is being devoted to that use," *A Helping Hand,* 515 F.3d at 370-71 (internal quotation marks omitted), one who records a TDR provides "constructive notice" of his development rights "to the world at large," *see Select Portfolio Servicing, Inc. v. Saddlebrook W. Util. Co.*, 145 A.3d 19, 51 (Md. Ct. Spec. App. 2016), *rev'd on other grounds*, 167 A.3d 606 (Md. 2017). If Maryland is to afford due process protection to the special exception in *National Waste Managers*, letter of understanding in *Frall*, DRRA described in *Blentlinger*, or to apply zoning estoppel when appropriate, as suggested in *Maryland Reclamation*, one who purchases and records TDRs while owning property in a TDR-receiving area deserves protection from arbitrary government action.

The very nature of the TDR program makes it indistinguishable from a land use permitting or licensing program. The TDR program, like land use permitting or licensing, seeks to manage local development with goals in mind: (1) to preserve the rural character of agricultural areas and (2) to increase density in specific areas in accordance with a specific plan. *See W. Montgomery Cty.*, 522 A.2d at 1330-31 (describing TDRs). Further, TDRs are purchased from third

parties in arms-length transactions, which, like permits or licenses, are allowable only with the County's authorization and management. *Id.*

The Complaint buttresses the notion that Pulte's TDRs provided it with a legitimate claim of entitlement. Pulte was "induc[ed] . . . to adhere to the County's long-touted agricultural preservation program," which "strongly encourage[d] two units per acre" on Pulte's land "through the purchase of TDRs." JA35. "Pulte in good faith relied on this zoning designation and the County's TDR policies" in purchasing both the land and 323 TDRs. JA35-36. Defendants then committed "an unprecedented attack on the County's vaunted TDR program and br[oke] faith with all those relying on it." JA62 (internal quotation marks omitted).

At a minimum, these allegations present probative questions of fact that make dismissal premature because "policies and practices," though not explicit, "may supplement" written rules with a sort of "unwritten 'common law'" and thereby create a protected property interest. *Perry*, 408 U.S. at 602-03; *see Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1237 (6th Cir. 1991) (reversing dismissal of police officer's claim based on right to promotion given allegation that city had a policy and practice of promotion based on eligibility exam performance *even though* city charter provided discretion to disregard results).

**2.    Pulte had a property interest in the right to use its land in accordance with the TDR Program, Master Plan, SRA 12-01, and Maryland Storm Water Management Act.**

The "right to use and enjoy" one's property, consistent with "fee simple ownership," is a "cognizable property interest." *Sansotta*, 724 F.3d at 540-41. Pulte had a right to use its land in accordance with the clear statutory and regulatory system in place before Defendants amended the Master Plan. This system consisted of four separate government acts: (1) the TDR program, (2) the Master Plan, (3) the Storm Water Management Act, and (4) SRA 12-01. These acts set out a specific path to development, and Pulte relied on these acts as it sought to use its property.

First, in 1984, Montgomery County's TDR program incentivized residential development, encouraging development of property in TDR-receiving areas and preservation of property in TDR-sending areas. *See W. Montgomery Cty.*, 522 A.2d at 1330-31. Relying on the program and at a cost in excess of $62 million, Pulte purchased 541 acres of property in a TDR-receiving area and purchased 323 TDRs from TDR-sending areas. JA38.

Second, in 1994, the Master Plan directed that certain property in Clarksburg be zoned RE-1/TDR-2 and that, once all of the triggers for Stage 4 development were met, water and sewer reclassification requests would be considered according to specific criteria. JA35-37. Accordingly, after Pulte purchased property in the

RE-1/TDR-2 zone and all of the triggers for Stage 4 development had been met, Pulte filed a reclassification request.  JA37.

Third, in 2007, Maryland passed the Storm Water Management Act, which required the use of ESD in managing stormwater runoff to the maximum extent practical in all developments.  JA46.  Accordingly, Pulte submitted a plan for development following "extensive engineering work" to use "ESD practices to the maximum extent practical," which would "reduce peak flow rates," *i.e.*, stormwater runoff, "below existing condition[s]" and "achieve hydrologic stream protection."  JA46, JA50, JA61, JA71.

Fourth, in 2012, the County passed SRA 12-01, which placed the subject property in Tier II, thereby designating it for public sewer and municipal growth. JA39.

For nearly three decades, Defendants created a detailed system governing development, and Pulte repeatedly sought to use its property in accordance with that system.  This is a far cry from the plaintiff who merely purchases property in reliance on zoning alone and then watches as the zoning is changed before it can obtain a permit and put a shovel in the ground.[3]  Pulte had a legitimate claim of

---

[3] In this way, this case starkly differs from a recent decision by this Court finding no protected property interest in an existing zoning use.  *See Siena Corp. v. Mayor & City Council of Rockville*, 873 F.3d 456, 462 (4th Cir. 2017).  In *Siena*, a developer purchased land zoned light-industrial with the hope of building a self-storage facility and then watched as the local government passed a zoning

entitlement to use its property in a manner consistent with three decades of government action and a decade of its own conduct.[4]

### 3. Pulte had a protected interest in the proper consideration of its water-sewer reclassification.

Under Maryland law, local governments do not have the "discretion to set up criteria . . . and then refuse to permit any change when an applicant has met the criteria in a specific classification." *Prince George's Cty. v. Carusillo*, 447 A.2d 90, 94 (Md. Ct. Spec. App. 1982). Independent of whether local governments have the ultimate discretion to grant or deny permit applications, they are "bound by [their] own criteria." *Id.* at 95. They cannot "bootstrap," for example, their "desire to retard or thwart development in a commercially zoned area onto a statute designed to prevent sewer moratoria." *Id.* (footnotes omitted). Or as Chief Judge Blake put it in *Frall*, a developer has a "legitimate claim of entitlement to a

---

ordinance prohibiting self-storage facilities within 250 feet of a school, preventing it from building the facility. *Id.* at 459-60. By contrast, Pulte relied on nearly three decades of consistent development through the use of TDRs, nearly two decades of consistent development in accordance with the Master Plan, state law mandating the use of environmental management tools that mirrored Pulte's planned development, and its property's designation as Tier II and a local regulation affirming that its property was to be extended public sewer service to facilitate development.

[4] Holding otherwise would be inequitable in this case, when the allegations make clear that Defendants blocked Pulte from obtaining a permit and putting a shovel in the ground by virtue of the five-year long water-sewer reclassification moratorium implemented only after Pulte duly submitted its Master-Plan-envisioned reclassification request. JA39, JA46.

*reasonable review* of its . . . reclassification request," even if the ultimate grant or denial of that request is within the local government's discretion. 2008 WL 4533910, at *9 (internal quotation marks omitted) (emphasis added).

In accordance with Maryland law, Pulte had a protected property interest in the consideration of its water and sewer reclassification request within the bounds of the criteria mandated by the Master Plan. As the Master Plan instructs: once the Stage Four triggers have been met, "the County Council *will* consider Water and Sewer Plan amendments," "*will* . . . [e]valuate the water quality results associated with . . . substantially similar watersheds," and "*shall* draw upon the standards established by federal, state, and County laws and regulations" and assess "voluntary measures taken by property owners in the Stage 4 area." JA36-38 (emphases added). The District Court ignored these mandatory criteria. Instead, it focused only on the discretion afforded to Defendants. *See* JA697. Yet under Maryland law, local governments do not have the discretion to ignore their own criteria in reaching a decision. To hold otherwise is to render Defendants unreviewable.

## B.    Defendants Deprived Pulte of Its TDRs.

While the District Court correctly concluded that Pulte "possessed a property interest" in the TDRs "themselves," it wrongly surmised that Pulte failed to "allege that [it had] been deprived of this property interest." JA697. On the

48

contrary, Pulte properly alleged that Defendants "effectively wip[ed] out" Pulte's TDRs. JA62. To conclude otherwise on a Rule 12 motion runs afoul of *Twombly*. Whether the TDRs have any residual value, and how much, is a question of fact that can only be resolved by way of additional discovery. That Pulte "still own[s]" the TDRs, *see* JA697, is of no moment because Defendants wiped out their value. Accordingly, and at a minimum, Pulte's TDRs are property interests entitled to protection under the Due Process Clause.[5]

## VI. THE DISTRICT COURT ERRED IN HOLDING THAT PULTE FAILED TO ALLEGE THAT DEFENDANTS ARBITRARILY AND IRRATIONALLY VIOLATED PULTE'S SUBSTANTIVE DUE PROCESS RIGHTS.

To state a substantive due process claim, a plaintiff deprived of a property interest must allege that the deprivation is "so far beyond the outer limits of legitimate government action that *no process* could cure the deficiency." *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 281 (4th Cir. 2008) (internal quotation marks omitted).

The District Court made two errors in concluding that the Complaint fell short of this standard. First, this standard requires an assessment of facts. Second, the pleadings must be construed in Pulte's favor.

---

[5] Because the District Court relied solely on Pulte's alleged lack of a property interest to dismiss its procedural due process claim, *see* JA700, a reversal on this ground warrants remand to consider that claim.

A. **Whether "No Process" Could Have Protected Pulte's Due Process Rights Depends on the Facts of the Dispute.**

While "reluctan[t] to sit as zoning boards of appeals," this Court will strike down land use actions when the facts demonstrate that a deprivation is so irrational that no process could cure the deficiency. *Scott v. Greenville Cty.*, 716 F.2d 1409, 1419 (4th Cir. 1983) (internal quotation marks omitted).

To determine whether a deprivation is so irrational that it violates substantive due process, this Court engages in a fact-specific inquiry of the legislation and its surrounding circumstances. *See MLC Auto*, 532 F.3d at 281. The Court assesses, "among other factors," whether the action is (1) "tainted with fundamental procedural irregularity," (2) "targeted at a single party," and (3) a deviation from or "inconsistent with regular practice." *Id.* (citing *A Helping Hand*, 515 F.3d at n.10). Additionally, the Court examines the legislation's underlying motive. *See id.* When legislation is the product of "illegitimate political or, at least, personal motives," rather than legitimate land use issues, it "violates the Constitution *even where no recognized class-based or invidious discrimination was involved.*" *Marks v. City of Chesapeake*, 883 F.2d 308, 311-13 (4th Cir. 1989) (internal quotation marks omitted).

In *MLC Auto*, this Court held that a claim challenging rezoning that prevented the erection of a car dealership should survive summary judgment. 532 F.3d at 282. As to the three factors, the Court noted that the rezoning occurred

50

"without any reference to the comprehensive plan," targeted the landowner alone, and was made "without any studies" and at the behest of the first citizen petition in fifteen years. *Id.* As to motive, the Court emphasized that the citizens' support of rezoning the land centered not on "legitimate land use issues but upon dislike of car dealerships." *Id.* This, the Court explained, was "the very arbitrary exercise of power the due process clause is intended to protect against." *Id.*

Other circuits have reached similar results. *See, e.g., Simi Inv. Co. v. Harris Cty.*, 236 F.3d 240, 251-54 (5th Cir. 2000); *Catanzaro v. Weiden*, 140 F.3d 91, 95 (2d Cir. 1998); *Lockary v. Kayfetz*, 917 F.2d 1150, 1155-56 (9th Cir. 1990). In *Simi*, the Fifth Circuit held that a county irrationally deprived an owner of right-of-way access to a public street by speciously "inventing a park" to benefit local private business interests. 236 F.3d at 251-54. In *Lockary*, the Court reversed a grant of summary judgment because the plaintiff showed that the alleged water shortage allegedly justifying the water permit moratorium did not actually exist. 917 F.2d at 1155-56. And in *Catanzaro*, the Second Circuit reversed a grant of summary judgment because building-owners showed that city officials may have demolished their building simply because it was in a deteriorating community, not because it was posing an immediate danger. 140 F.3d at 95.

Ignoring the factual allegations in the Complaint and relying on Defendants' exhibits, the District Court prematurely concluded that Defendants' actions were

51

supported by a rational basis. The District Court did not assess whether Defendants' actions were procedurally irregular, singled out Pulte, or deviated from standard practice. Instead, the Court let the challenged legislation alone serve as proof of a rational motive. Such tautology makes it impossible to plead a substantive due process claim when faced with legislation containing a putative rationale in its text. This flies in the face of *MLC Auto*, *Marks*, and *Scott*, all of which indicate that reality matters when assessing substantive due process claims.

### B. Read in the Light Most Favorable to Pulte, the Complaint Alleges That Defendants' Actions Were Arbitrary and Irrational.

The 71-page Complaint makes clear that Defendants' actions were replete with procedural and substantive irregularities, targeted Pulte, deviated from standard practice, and were grounded in pre-determined junk science. But instead of looking to those allegations, the District Court improperly considered the Master Plan Amendment.

First, the Complaint alleges a variety of significant procedural irregularities. A joint committee considering the Amendment solicited testimony after the record was closed while providing no opportunity to respond. JA73-74. In addition, "in an extraordinary break with common procedure," a Council work session recommending approval of the Special Protection Area (covering Pulte's property) was held "*prior* to the Council holding the public hearing on the very same matter." JA80-81.

Second, the Complaint repeatedly asserts that Defendants targeted Pulte with "radical[]" impervious caps, open space requirements, parkland dedication requirements, conservation management plans, and other requirements "cumulatively applicable to no other property in the Ten Mile Creek watershed." JA83-84. To put it plainly, Defendants "abused their planning, zoning, and development regulation powers to single out and target [Pulte] for 'special treatment.'" *Id*.

Third, the Complaint makes clear that Defendants' conduct was not only inconsistent with regular practice, but "unprecedented" in nature. *See, e.g.,* JA62, JA68, JA80. Despite Maryland law to the contrary, Defendants disregarded ESD. JA67, JA70, JA74, JA84. Despite previously considering water-sewer reclassification requests on a biannual basis, Defendants failed to act on Pulte's duly filed water-sewer reclassification request for almost five years, then declared an extraordinary and indefinite moratorium on *all* pending water-sewer reclassification requests. JA46.

Taken together, the Complaint shows government actors concerned more with blocking Pulte's development plan than actively preserving Ten Mile Creek. Defendants fraudulently engineered opinions to reach the preferred result. JA57-58. Defendants abandoned initially touted models upon discovering out-of-step results. JA65. And Defendants totally disregarded the bulk of the evidence.

JA73-74.  These allegations demonstrate that no amount of process would have prevented the deprivation of Pulte's constitutionally protected property interests. Defendants had a goal in mind, and they would have done whatever necessary, no matter how irrational, to reach it.

But none of this is reflected in the District Court's opinion, which solely credits the assertions in the very legislation being challenged, even when *directly contradicted* by the Complaint.

The District Court notes the Amendment's purported concern with "environmental analyses" showing "continued uncertainty about the ability to protect sensitive resources in Ten Mile Creek if full development occurred under the original Plan recommendations."  JA699 (internal quotation marks omitted). The Complaint, meanwhile, repeatedly alleges that all of these analyses were so fundamentally flawed that they bordered on unethical.  JA56-58.

The District Court opines that "restricting imperviousness ... provides the best chance of protecting streams," and "maintaining and expanding forest cover ... is essential to protection of water quality and habitat."  JA699 (quoting JA598-99). The Complaint, on the other hand, says that "establishing an Impervious Cap is not a valid planning tool," JA65, and not only repeatedly asserts that Pulte's ESD plan would fully protect Ten Mile Creek, but describes *why* this is so, explaining that

"engineering controls *can* provide storage and minimize release of water more so than existing conditions," JA72.

## VII.  THE DISTRICT COURT ERRED IN DISMISSING PULTE'S CLAIM UNDER ARTICLE 19 OF THE MARYLAND CONSTITUTION.

Article 19 of the Maryland Declaration of Rights provides that every person "for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land."  Md. Const., Decl. of Rights, Art. 19.  This "protects two interrelated rights:  (1) a right to a remedy for an injury to one's person or property; [and] (2) a right of access to the courts."  *Jackson v. Dackman Co.*, 30 A.3d 854, 866 (Md. 2011) (internal quotation marks omitted).  The District Court erred by narrowly circumscribing this state law claim to those instances where a party has a constitutionally protected property interest or a governmental actor has immunity from suit.  JA706-07.

### A.   An Article 19 Claim Does Not Require a Constitutionally Protected Property Interest.

There is no corollary to Article 19 in the U.S. Constitution and "most [Maryland Court of Appeals] opinions interpreting and applying Article 19 have not relied on cases applying dissimilar provisions of the United States Constitution."  *Dua v. Comcast Cable of Md., Inc.*, 805 A.2d 1061, 1071 (Md.

2002).  Indeed, "Article 19 provides a measure of constitutional protection even for causes of action *which are not based on constitutional rights and which may not have accrued* when the challenged governmental action occurred."  *Id.* (emphasis added).

As a result, in cases where the existence of a constitutionally protected property interest is at issue, Maryland courts have not relied on this analysis for assessing Article 19 claims.  *See, e.g., Rios v. Montgomery Cty.*, 872 A.2d 1, 19-21 (Md. 2005); *Johnson v. Md. State Police*, 628 A.2d 162, 168 (Md. 1993).

Yet without citation or analysis, the District Court concluded that Article 19 hinges on the existence of a constitutionally protected property interest.  *See* JA706.  Article 19 contains no such requirement, and Maryland courts have not read in any such requirement.  The District Court had no basis for imposing this requirement onto Pulte's Article 19 claim.

### B.    An Article 19 Claim Does Not Require Actual Immunity From Suit.

Article 19 "guarantee[s] access to the courts."  *Doe v. Doe*, 747 A.2d 617, 624 (Md. 2000) (internal quotation marks omitted).  Among other things, Article 19 ensures that government actions against persons or property are subject to judicial review by "prohibit[ing] unreasonable restrictions upon traditional remedies or access to the courts."  *Jackson*, 30 A.3d at 866 (internal quotation

marks omitted). Maryland courts determine the reasonableness of such restrictions on a case-by-case basis. *See id.*

In *Piselli v. 75th Street Medicine*, the Court of Appeals demonstrated that *effective* immunity will suffice to trigger the protections of Article 19. 808 A.2d 508, 524-26 (Md. 2002). Therein, the Court held that the time limitation for a medical malpractice action involving a minor violated Article 19. *Id.* at 526. Critically, this was not premised on actual immunity, as the parents could have filed a lawsuit on behalf of their child within the limitations period. *See id.* at 524.

Nevertheless, the District Court erroneously concluded that Article 19 requires actual immunity from suit. JA706-07. Pulte, of course, does not contend that Defendants have actual immunity. Rather, Pulte's position is that if Pulte's right to develop its property cannot form the basis of a due process claim for lack of a property interest, it is only because Defendants, in bad faith, actively prevented Pulte's rights from vesting.

Consider the facts. In 2009, when Pulte submitted its water-sewer reclassification request pursuant to Defendants' Master Plan, all of the Stage 4 triggers had been met. JA38-39. Pulte's planned development embraced ESD and existing State and local laws. JA39. Pulte validly purchased and recorded over 300 TDRs for use in connection with the development of its TDR-zoned property, as provided for by a legislative program in place for over two decades. JA38; *see*

*also W. Montgomery Cty.*, 522 A.2d at 1330-31. This put Defendants in a bind. Without a legitimate basis to deny Pulte's water-sewer reclassification request or proposed pre-preliminary plan, but desiring to stall and block Pulte's development, Defendants delayed the reclassification until Defendants could downzone Pulte's land and prevent Pulte from obtaining a permit and putting a shovel in the ground. *See* JA38-46.

By so doing, Defendants effectively immunized themselves in violation of Article 19.

## **CONCLUSION**

For these reasons, the District Court's order granting Defendants' Rule 12(c) Motions should be reversed.


Dated:  November 20, 2017          Respectfully submitted,

*/s/ Deborah J. Israel*
Deborah J. Israel
Louis J. Rouleau
Lela M. Ames
Pascal F. Naples
Womble Bond Dickinson (US) LLP
1200 Nineteenth Street, N.W., Suite 500
Washington, DC  20036
(202) 857-4466

*Counsel for Appellants Pulte Home Company, LLC (formerly Pulte Home Corporation) and Shiloh Farm Investments, LLC*

58

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 34(a), Pulte respectfully requests that the Court hear oral argument in this matter.  Oral argument is warranted because this case involves novel and complex questions of constitutional law and has a complicated factual history.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure Rule 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 12,986 words.

This brief complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Dated:  November 20, 2017          */s/ Deborah J. Israel*_____
                                                        Deborah J. Israel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of November, 2017, I caused a true and correct copy of the foregoing Brief of Appellants to be filed electronically via the Court's CM/ECF system, which will send notice of such filing to the following registered CM/ECF users:

Marc P. Hansen
John P. Markovs
Patricia P. Via
Paul F. Leonard, Jr.
Office of the County Attorney
101 Monroe Street
Rockville, MD  20850
marc.hansen@montgomerycountymd.gov
john.markovs@montgomerycountymd.gov
patricia.via@montgomerycountymd.gov
paul.leonard@montgomerycountymd.gov

*Counsel for Appellee Montgomery County, Maryland*

Erek L. Barron
Whiteford, Taylor & Preston, LLP
7501 Wisconsin Avenue, Suite 700W
Bethesda, MD  20814
ebarron@wtplaw.com

*Counsel for Appellee Montgomery County, Maryland*

John J. Hathway
Whiteford, Taylor & Preston, LLP
1800 M Street, NW, Suite 450N
Washington, DC  20036
jhathway@wtplaw.com

*Counsel for Appellee Montgomery County, Maryland*

Howard R. Feldman
Cara C. Murray
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1500
Baltimore, MD  21202
hfeldman@wtplaw.com
cmurray@wtplaw.com

*Counsel for Appellee Montgomery County, Maryland*

Adrian R. Gardner
William C. Dickerson
Elizabeth L. Adams
Maryland-National Capital Park and Planning Commission
6611 Kenilworth Avenue, Suite 200
Riverdale, MD  20737
adrian.gardner@mncppc.org
william.dickerson@mncppc.org
elizabeth.adams@mncppc.org

*Counsel for Appellee Maryland-National Capital Park and Planning Commission*

Aaron L. Casagrande
Patrick D. McKevitt
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1500
Baltimore, MD  21202
acasagrande@wtplaw.com
pmckevitt@wtplaw.com

*Counsel for Appellee Maryland-National Capital Park and Planning Commission*

I hereby further certify that on this 20th day of November, 2017, I caused a true and correct copy of the foregoing Brief of Appellants to be served via hand delivery on:

Patricia S. Connor, Clerk
United States Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, VA  23219-3517

/s/ Deborah J. Israel
Deborah J. Israel